276 F.2d 932
 CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant,
v.
CITY OF NORTH KANSAS CITY, MISSOURI, a Municipal Corporation, Appellee.
CITY OF NORTH KANSAS CITY, MISSOURI, a Municipal Corporation, Appellant,
v.
CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellee.
 No. 16308.
 No. 16309.
 United States Court of Appeals Eighth Circuit.
 April 12, 1960.
 
 Andrew C. Scott, Chicago, Ill., for the Chicago, Burlington & Quincy R. R. Co.
 Wilfred Wimmell, Brenner, Wimmell, Ewing & Lockwood, Kansas City, Mo., for the City of North Kansas City, Missouri.
 Before GARDNER, VOGEL and VAN OOSTERHOUT, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal by defendant Chicago, Burlington & Quincy Railroad Company, hereinafter called Burlington, from a judgment rendered against it in favor of City of North Kansas City, Missouri, for $138,475.62 as a recovery of the cost of construction by the city of 514 feet of subterranean combined sanitary and storm sewer extending under and across Burlington's North Kansas City train yard at a point ten to eighteen feet below the surface of the ground.
 
 
 2
 Jurisdiction based upon diversity of citizenship and the requisite amount is established.
 
 
 3
 North Kansas City is a municipal corporation of the state of Missouri, having a population at all times here material of less than 30,000 inhabitants. North Kansas City's suit is based upon §§ 7530 to 7536 inclusive of Missouri 1939 Revised Statutes (389.670 to 389.690 V.A. M.S.) which read:
 
 
 4
 "7530. Railroads must maintain storm sewers along right of way in certain cities. —
 
 
 5
 "It is hereby made the duty of every person, company or corporation, owning, operating or controlling any railroad or railroad right of way passing through any incorporated village, town or city within this state, containing a population of thirty thousand inhabitants or less, to construct at their own expense, within the corporate limits of such village, town or city along the lines of their said railroads or railroad right of way, such sewers as shall be of sufficient capacity to at all times carry off all the surface water that may collect or accumulate along their right of way. R.S.1929, § 7376; [R.S.1919, § 8784; R.S.1909, § 9640.]"
 
 
 6
 "7531. Manner of construction. —
 
 
 7
 "Such sewers shall be constructed in a substantial manner, and cemented on their sides and bottoms so as to give to same a hard, smooth surface, and shall be of sufficient volume and depth to carry off at all times all surface water, with such facility as to prevent at all times an overflow therefrom. They shall have good, safe wagon and foot crossings constructed over them, at such places where the village, town or city by ordinance shall direct, and where it is necessary for public travel. R.S.1929, § 7377 [R.S.1919, § 8785; R.S.1909, § 9641]."
 
 
 8
 "7532. Sewers across right of way. —
 
 
 9
 "It shall be the further duty of all such persons, companies and corporations to construct under their railways, from one side of their right of way to the other, such sewers as shall by the city council, board of aldermen or legislative body of such villages, towns or cities be deemed necessary to facilitate the proper drainage of such village, town or city as provided herein. R.S.1929, § 7378 [R.S.1919, § 8786; R.S.1909, § 9642]."
 
 
 10
 "7533. Where district sewers cross beneath tracks — notice to be given — plans, etc. —
 
 
 11
 "Whenever any such village, town or city shall, by ordinance, deem it necessary to construct any public or district sewer, it shall, after the passage of the ordinance deeming such work necessary, cause its civil engineer, street commissioner or any other suitable person to file plans, profile and specifications for such sewer with the clerk of such village, town or city, which plans, specifications and profile shall show the points of intersection of such sewer with such railroad right of way, also the grade of the bottom of such sewer, its breadth and depth, with a general statement of the material to be used in its construction, together with such information as will be necessary to a correct understanding of the general plan for the building of such sewer. Thereupon it shall cause a copy of such plans, specifications and profile, together with a general statement sufficiently succinct and explanatory to give a correct understanding of the plan adopted for the building of said sewer, to be served on said person, company or corporation, together with a notice directed to such person, company or corporation to construct the section of said sewer to extend from one side of the said right of way to the other, in accordance with such plans and specifications, and within a certain time, not less than thirty days, and not more than three months from the date of the service of such notice. R.S.1929, § 7379 [R.S.1919, § 8787; R.S.1909, § 9643]."
 
 
 12
 "7534. City to serve notice on railway — penalty for refusal to conform to notice. —
 
 
 13
 "Such notice, plans and specifications shall be served on the person, company or corporation owning or controlling said right of way by the chief of police or marshal of such village, town or city, who shall deliver a copy of the notice, plans and specifications to the nearest station agent of such person, company or corporation; and he, the said officer, shall make return on the original notice of the time and manner of service, and file the same with the village, town or city, as the case may be. Such service shall be a sufficient legal service. Thereupon such person, company or corporation shall proceed to construct such section of the proposed sewer at their own expense. If, after the service of such notice, plans and specifications as herein provided, such person, company or corporation shall fail, neglect or refuse to so construct said section of the proposed sewer across their right of way within the time mentioned in such notice, then for each day after the expiration of said time that said person, company or corporation shall neglect, fail or refuse to construct or complete said section of such proposed sewer, they shall forfeit and pay to such village, town or city the sum of twenty-five dollars, to be recovered by civil action in the circuit court of the county in which such village, town or city is situated. R.S.1929, § 7380 [R.S.1919, § 8788; R.S.1909, § 9644]."
 
 
 14
 Sections 7535 and 7536 impose liability where damage from overflow results from failure to comply with the preceding sections.
 
 
 15
 The primary statute relied upon is 7532 but related statutes which were all a part of the act passed in 1909 are set out as the Missouri Supreme Court in Terminal R. R. Ass'n of St Louis v. City of Brentwood, 360 Mo. 777, 230 S.W.2d 768, stated that since sections 7530 to 7536 were all part of a single act they must be read and construed together.
 
 
 16
 The requirements of section 7530 are not here directly involved as said section pertains to drainage of surface water accumulated on the railroad right-of-way. The trial court found no surface water gathered on the Burlington's right-of-way.
 
 
 17
 Most of the material facts are undisputed. Early in 1949 North Kansas City enacted a series of five ordinances pursuant to Missouri law for the purpose of bringing about the construction of the sewer here involved and providing for the levying of taxes to pay for it. Said ordinances determined that public convenience and necessity required the proposed sewer, approved plans and specifications, provided for an election on a bond issue to pay the cost of the sewer, determined that the voters had approved the project, called for bids, awarded a contract for the construction of the sewer, and provided for the issuance and sale of the authorized bonds. In all such proceedings the sewer is described as a combination storm and sanitary sewer. Such proceedings related to the entire sewer project, including the portion thereof underlying Burlington's right-of-way.
 
 
 18
 North Kansas City is authorized by statute pertaining to cities of its class to provide for the construction of a sewer of the type here involved and to levy taxes to pay for the construction thereof. Section 88.670 V.A.M.S.
 
 
 19
 Burlington's train yard in North Kansas City is immediately east of and borders on the Missouri River. The sewer here involved empties into the river. Eighteen parallel tracks run in a north and south direction. Burlington Avenue and Highway 71 run north and south about 1250 feet east of the Burlington train yard and form a solid barrier between the train yard and a large portion of the 234 acre area served by the sewer. The natural drainage for the bulk of the area served by the sewer was not over Burlington's yards. The sewer also served as a sanitary sewer for 360 residential units and for a few industrial concerns. Such use of the sewer was claimed to be temporary. The court in its opinion states the sewer was still being used for sanitary purposes. The court made a finding on disputed evidence reading: "If carriage of this small amount of sanitary sewage had never been intended, the design of the sewer and the cost of its construction would still have been exactly as it was."
 
 
 20
 Burlington owns 796 acres of railroad property in North Kansas City. Under Missouri law all real property owned by railroads within the corporate limits of a city "shall be subject to special assessments for public improvements made by any such city, town or village, in the same manner and to the same extent in all respects as the real property of any other person or corporation therein." 88.100 V.A.M.S.
 
 
 21
 Some months after the sewer project was authorized and a construction contract for the entire sewer had been entered into, and as the construction reached Burlington's right-of-way, Burlington notified the contractor not to enter its right-of-way until the city had obtained an easement to cross such right-of-way. The city then served a notice upon Burlington pursuant to section 7533 heretofore set out, requiring Burlington to construct at its own expense the sewer under its right-of-way. Negotiations followed between Burlington and the city which resulted in a written agreement under which the city was authorized to construct the sewer across the right-of-way, the city to pay the cost thereof, with the provision that such agreement was without prejudice to Burlington's denial of its obligation to construct any part of the sewer and without prejudice to other claims it had asserted; with the further provision that if it was finally determined by a court of competent jurisdiction that Burlington was obligated to construct the part of the sewer underlying its right-of-way, Burlington would reimburse the city for its reasonable cost of constructing such part of the sewer.
 
 
 22
 Burlington's defenses to the city's claim are thus stated by the trial court:
 
 
 23
 "(1) that the statute makes railroads liable for the construction of a sewer only when the railroad right-of-way causes accumulation of water along the right-of-way and not when water accumulates elsewhere from other causes. In line with this argument defendant introduced evidence tending to show that the natural drainage of the area was to the north or to the south and east, and that its right-of-way did not cause water to accumulate in the area served by this sewer.
 
 
 24
 "Defendant argues that the proper direction in which to drain the water was to the east or southeast, and that the City caused undue expense by electing to run the sewer to the west under its tracks.
 
 
 25
 "(2) Defendant also contends that the statute was not intended to and does not apply where the sewer to be constructed is other than a storm sewer; that since this sewer always has and still does carry sanitary sewage it is, despite the plaintiff's professed intentions, a sanitary sewer, and defendant is thus relieved of obligation to pay for its construction.
 
 
 26
 "(3) Defendant further attacks the constitutionality of the statutes and insists that the requirements are in violation of defendant's constitutional rights, that the City could not proceed without first obtaining an easement;
 
 
 27
 "(4) that the obligation of the City under the provisions of the bond issue require that all such sewers be paid for out of the proceeds of the bond sales and not from other sources, such as an assessment against defendant; that defendant owns within the City 796 acres of land which are subject to the tax provided for the payment of interest and the retirement of the bonds, and that it would be unlawful to assess this tax against the property of defendant and also to require it to pay for the cost of the sewer beneath its right-of-way.
 
 
 28
 "(5) Defendant's final contention is that the statute, by placing the burden on only one class of property owners (railroads) to build sewers in only designated classes of cities (third and fourth classes) denies to the railroads the equal protection of the laws, in violation of the Federal Constitution."
 
 
 29
 Burlington's defense, including its federal constitutional defense, is somewhat broader than the statement of the trial court indicates. Burlington's constitutional defense is thus stated in its brief:
 
 
 30
 "The Court erred in holding the statute (Sec. 7532, R.S.Mo.1939 — now 389.670, Par. 3, R.S.Mo.1949), when applied to the 514-foot subterranean sewer across Burlington's trainyard (1) did not take property without due process, (2) did not deny the equal protection of the law — in violation of the Fourteenth Amendment to the United States Constitution and in violation of Sec. 10, Article I, of the Missouri Constitution [V.A.M.S.]; and (3) did not constitute the passage of a local or special law when a general law could have been made applicable, in violation of Sec. 40, Par. 30, Article III, of the Missouri Constitution."
 
 
 31
 In any event, it is clear that Burlington has adequately raised the issue of the proper interpretation of section 7532 and the defense that if the statute is interpreted in the manner urged by the city, Burlington's state and federal constitutional rights are violated.
 
 
 32
 The court interpreted section 7532 broadly, stating: "So long as a sewer required to be constructed facilitates the drainage of the city, as the sewer in question clearly does it would seem clearly to be within the meaning of the statute."
 
 
 33
 The court considered the City of Brentwood case, supra, and stated that he was not persuaded that the Brentwood decision would be applied to the type of sewer involved in the present case. The court then rather summarily rejected Burlington's constitutional contentions and held Burlington was liable for the construction of the part of the sewer underlying its right-of-way, and proceeded to enter final judgment against Burlington for such costs.
 
 
 34
 Burlington in its reply brief raises for the first time the question that the abstention doctrine should be applied to this case because the question of interpretation of Section 7532 here presented raises a doubtful question of Missouri law which has not been adjudicated by Missouri appellate courts, and that the statute if interpreted in the manner urged by the city raises serious federal constitutional questions.
 
 
 35
 In the ordinary diversity case, a federal court is required to determine doubtful questions of state law and cannot relinquish jurisdiction in favor of state courts solely because difficult and doubtful questions of state law are presented. Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9.
 
 
 36
 The Supreme Court has in a long line of recent decisions required that under certain unusual circumstances, the federal court should stay action pending determination by the state court of decisive questions of state law. It is firmly established that in the situation where the federal constitutionality of a statute may depend upon the interpretation placed upon the statute by the state court, the statute should first be interpreted by the state court and the federal court should withhold action pending the state court interpretation of the statute. Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186; Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058.
 
 
 37
 The doctrine of abstention was established in Railroad Commission of Texas v. Pullman Co., supra. The Supreme Court there held that the construction of a doubtful state statute should be left to the state court as such court is the only court that can authoritatively construe the state statute. The court at page 500 of 312 U.S., at page 645 of 61 S.Ct. states:
 
 
 38
 "In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. Glenn v. Field Packing Co., 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252; Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337. The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication."
 
 
 39
 The court calls attention to the fact that a state construction of the statute may eliminate the necessity for reaching the federal constitutional question and that such procedure is in harmony with the well established principle of not reaching constitutional questions unless such a course is unavoidable. While the earlier cases in which the doctrine of abstention was applied were equity cases in which the decision in part was based upon the exercise of discretion by the chancellor, it is now clear that the doctrine applies to actions at law. Louisiana Power & Light Co. v. City of Thibodaux, supra, was an action at law, an eminent domain proceeding. The court applied the abstention doctrine, stating at page 28 of 360 U.S., at page 1072 of 79 S.Ct.
 
 
 40
 "* * * where the issue touched upon the relationship of City to State, Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355, or involved the scope of a previously uninterpreted state statute which, if applicable, was of questionable constitutionality, Leiter Minerals, Inc., v. United States, 352 U.S. 220, 229, 77 S.Ct. 287, 292, 1 L.Ed.2d 267, we have required District Courts, and not merely sanctioned an exercise of their discretionary power, to stay their proceedings pending the submission of the state law question to state determination.
 
 
 41
 "These prior cases have been cases in equity, but they did not apply a technical rule of equity procedure. They reflect a deeper policy derived from our federalism."
 
 
 42
 In Harrison v. N. A. A. C. P., supra, plaintiff sought to enjoin the enforcement of five Virginia statutes alleged to be unconstitutional. The statutes had not been previously interpreted by the Virginia court. The trial court held two statutes vague and ambiguous and withheld judgment as to them, retaining jurisdiction pending construction by the state court, but declared the other three statutes unconstitutional and enjoined their enforcement. Upon appeal, the Supreme Court held that the trial court should have abstained from reaching the constitutional issue as to all of the statutes until after they were interpreted by the state court. In speaking of the abstention doctrine, the court says:
 
 
 43
 "In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. (Citations omitted.) This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication. See Chicago v. Fieldcrest Dairies, Inc., supra, 316 U.S. at pages 172-173, 62 S.Ct. at page 988." 360 U.S. at pages 176, 177, 79 S.Ct. at page 1030.
 
 
 44
 Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed. 2d 1163, relied upon by the city, does not dispute the validity or principles and decisions just discussed. The majority opinion, at page 189, of 360 U.S., at page 1063 of 79 S.Ct., states:
 
 
 45
 "This Court has sanctioned a federal court's postponement of the exercise of its jurisdiction in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law."
 
 
 46
 The majority decision holding that the abstention doctrine should not be applied is based upon a conclusion that the applicable state law was well settled by state court decisions and that no substantial federal constitutional issue was raised.
 
 
 47
 The city calls attention to the fact that Burlington did not raise the abstention issue in the trial court. Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480, and City of Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, cited by the city, do not deal with factual situations warranting the application of the abstention doctrine. No federal constitutional issue was involved in the Propper case. In the Atchison, T. & S. F. R. Co. case, the court states at page 84 of 357 U.S., at page 1067 of 78 S.Ct.: "We see no ambiguity in the section which calls for interpretation by the state courts."
 
 
 48
 Our examination of the cases shows that in many instances the abstention issue was raised for the first time in the Supreme Court, and then by the Court itself. City of Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562; Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983; City of Chicago v. Fieldcrest Dairies, Inc., supra; Railroad Commission of Texas v. Pullman Co., supra.
 
 
 49
 In Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, at page 105, 65 S.Ct. 152, at page 154, 89 L.Ed. 101, the court says:
 
 
 50
 "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality — here the distribution of the taxing power as between the State and the Nation — unless such adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law."
 
 
 51
 The foregoing statement is quoted with approval in the Leiter Minerals, Inc., case, supra, 352 U.S. at page 229, 77 S.Ct. at page 292.
 
 
 52
 There is much to be said in favor of raising the abstention issue at the earliest possible time. Ordinarily, issues not raised in the trial court cannot be considered upon appeal. Possibly the failure to raise the abstention issue in the trial court may be entitled to some consideration in doubtful cases, but we believe that the cases just cited establish that the public policy underlying the application of the abstention doctrine in appropriate situations is so strong that the duty of an appellate court to consider abstention is not affected by a failure to raise the question in the trial court.
 
 
 53
 For the same reason, the fact that Burlington procured the removal to the federal court of the case commenced in the state court does not bar the application of the abstention doctrine. The cases heretofore cited and discussed make it clear that the doctrine of abstention should be applied if this case presents a substantial federal constitutional issue which might be mooted by a state court determination of state law.
 
 
 54
 The interpretation of section 7532 has been considered by the Missouri appellate courts on only two occasions. In the Brentwood case, supra, the Supreme Court of Missouri found the word "sewer" as used in section 7532 to be ambiguous and after considering the related sections of the same act, concluded that the word "sewer" as used in the act did not embrace a sanitary sewer. The question of whether the word sewer as used in the act was intended to include only surface ditches and drains required by the physical obstruction created by the track embankments or whether the word was intended to include deeply laid and expensive subterranean storm sewers was not decided in that case.
 
 
 55
 There is language in the related sections heretofore quoted pertaining to the duty of constructing foot and wagon bridges over sewers. The provision in section 7533 as to notice provides the sewers shall be constructed within the time ordered by the city, which shall be "not less than thirty days, and not more than three months from the date of service of such notice." It is unlikely that a sewer of the type here involved could be constructed within a three months period.
 
 
 56
 The court in Brentwood makes several references to the fact that the purpose of the act was "to make adequate provision for drainage of surface water which might be accumulated along or be obstructed by railroad structures and thereby to facilitate the proper drainage of towns." [360 Mo. 777, 230 S.W.2d 707.] Whether the railroad obstructed the flow of water at a depth of more than ten feet below its tracks, at a point where the sewer reached the right-of-way, and whether such obstruction, if any, was any different than that caused by any other property, at that depth, would appear to be debatable questions.
 
 
 57
 Moreover, as heretofore pointed out, the provisions authorizing the sewer and the contract for its construction described the project as a combination sanitary and storm sewer, and it is undisputed that the sewer was intended to be and was in fact used to some extent for sanitary purposes. If we accept the trial court's finding that the combined sewer is no different and costs no more than a storm sewer would, a statutory construction problem still remains as to whether the sewer here involved meets the terms of section 7532.
 
 
 58
 The other Missouri case interpreting the statute here in question is Williams v. St. Louis-San Francisco Ry. Co., 223 Mo.App. 8, 7 S.W.2d 392. We find nothing in this case bearing on the interpretation problem presented by our present case.
 
 
 59
 We hold that there is no authoritative interpretation of section 7532 by the Missouri appellate courts with reference to the statutory construction problem presented in this case.
 
 
 60
 Burlington has raised state constitutional objections to section 7532, which objections have heretofore been summarized. The court in Brentwood as an aid to construction, at page 770 of 230 S.W.2d, points out that complete general statutory authority was available there for the construction of the sanitary sewer and the levying of taxes to pay therefor. It is probable that a similar situation is presented here. As previously pointed out, prior to the construction of the sewer project involved in the present case, the statutory procedure for the authorization of the project and payment therefor had been completed. State constitutional questions should be resolved before federal constitutional questions are reached. City of Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, at page 641, 79 S.Ct. 455, 3 L.Ed. 2d 562.
 
 
 61
 We are satisfied that Burlington has raised substantial federal constitutional questions which will require consideration in event the statute is interpreted to impose liability upon Burlington for the construction of the segment of the sewer underlying its tracks. The trial court on the constitutional issue relied principally upon Chicago & Alton Railroad Co. v. Tranbarger, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 204. Many factual differences exist between the Tranbarger case and our present case. The statute in Tranbarger applied to all railroads in the state. The statute here applies only to railroads in cities under 30,000 population. In Tranbarger, surface drainage was obstructed by the railroad embankment. In our present case the railroad embankment did not obstruct the flow of the surface water.
 
 
 62
 The purpose of the abstention doctrine is to avoid an unnecessary decision on federal constitutional questions. Hence, we refrain from discussing in detail the constitutional issues and make no attempt to forecast what the ultimate decision should be upon the federal constitutional issues. We have examined the federal constitutional issues raised and the authorities bearing thereon cited by the parties.
 
 
 63
 It appears that Missouri has an adequate declaratory judgment law under which pertinent questions of state law can be determined. See 527.010 to 527.140, V.A.M.S. The Brentwood case appears to have been a declaratory judgment action.
 
 
 64
 Our determination that a doubtful question on the interpretation of a state statute is presented, and that the interpretation placed on the statute will have a material bearing upon the federal constitutional issues raised, places the duty upon us to invoke the abstention doctrine.
 
 
 65
 The judgment of the district court is vacated and the case is remanded to the district court with instructions to afford Burlington a reasonable opportunity to bring appropriate proceedings in the Missouri courts for the purpose of securing authoritative interpretation of section 7532, and for determination of the state constitutionality of said statute, the trial court to retain its own jurisdiction of this case for further proceedings consistent with the views expressed in this opinion.[1]
 
 
 
 Notes:
 
 
 [1]
 Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, at page 31, 79 S.Ct. 1070, at page 1074, 3 L.Ed.2d 1058, the Supreme Court states: "By retaining the case the District Court, of course, reserves power to take such steps as may be necessary for the just disposition of the litigation should anything prevent a prompt state court determination."