CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant-Respondent,

v.

NORTH KANSAS CITY, Missouri, a Municipal Corporation, Respondent-Appellant.

No. 49190.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied May 13, 1963.

**562**

Andrew C. Scott, Chicago, Ill., Arthur R. Kincaid, Liberty, Clyde J. Linde, Kansas City, for plaintiff-appellant; Eldon Martin, C. W. Krohl, Chicago, Ill., Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel.

John B. Ewing, Jr., James E. Lockwood, Kansas City, S. Preston Williams, William Harrison Norton, North Kansas City, for defendant-appellant; Brenner, Wimmell, Ewing & Lockwood, Kansas City, of counsel.

BOHLING, Commissioner.

The City of North Kansas City, Missouri, a municipal corporation, herein referred to as "City," invoking the provisions of RSMo 1939, §§ 7530–7536, sued the Chicago, Burlington & Quincy Railroad Company, an Illinois corporation and herein referred to as "Railroad," in the Circuit Court of Clay County, Missouri, to obtain reimbursement for the cost of constructing approximately 514 feet of a subterranean combined sanitary and storm sewer, 10 to 18 feet below the surface of the ground, under and across the Railroad's North Kansas City train yard. Railroad, a nonresident, removed the cause to the United States District Court for the Western District of Missouri. Chicago, B. & Q. R. Co. v. City of North Kansas City, 8 Cir., 276 F.2d 932. Briefly stated, the Railroad's answer presented defenses, among others, that said statutes did not apply in the circumstances of record; that they took defendant's prop-

erty without due process of law (Mo.Const. 1945, Art. I, § 10, V.A.M.S.), and constituted a local or special law when a general law could have been made applicable (Mo. Const.1945, Art. III, § 40(30)), and also that said statutes contravened provisions of the Constitution of the United States. Upon trial, the City secured a judgment of $138,475.62. Cross appeals resulted. The United States Circuit Court of Appeals for the Eighth Circuit dismissed the City's appeal, vacated the judgment upon the Railroad's appeal and remanded the case to the District Court with directions, applying the doctrine of abstention under which in appropriate instances a case in a federal court may be stayed pending a reasonable opportunity for a state court to pass on the applicability of a state statute to the facts involved and, if involved, the validity of the statute under the state constitution before ruling federal constitutional issues presented. Chicago, B. & Q. R. Co., supra l. c. 937[2], 940[7–9]. The mandate, so far as material here and in accord with the opinion, reads:

"On Consideration of the appeal of the Chicago, Burlington & Quincy Railroad Company, It is now here Ordered and Adjudged by this Court that the judgment of the said District Court be, and the same is hereby, vacated and the cause remanded to the District Court with instructions to afford the Chicago, Burlington & Quincy Railroad Company a reasonable opportunity to bring appropriate proceedings in the Missouri courts for the purpose of securing authoritative interpretation of section 7532 of Missouri 1939 Revised Statutes and for determination of the state constitutionality of said statute; the trial court to retain its own jurisdiction of this cause for further proceedings consistent with the views expressed in the opinion of this Court this day filed herein."

The Railroad, complying with said mandate, instituted this declaratory judgment proceeding (RSMo 1959, V.A.M.S. §§ 527.-010–527.130; Sup.Ct.Rules 87.01–87.11, V. A.M.R.) to determine whether said § 7532

is applicable to the case pending in the United States District Court and, if it is applicable, its validity under the Missouri constitution. The trial court found the issues tried in favor of the City; that is, that § 7532 was applicable and the applicable provisions of RSMo 1939, §§ 7530–7536 did not contravene any Missouri constitutional provision. Cross appeals again resulted.

The City's answer sought to expand the issues and have the whole case determined in the state courts on the merits in this proceeding. The Railroad's motion to strike all the additional issues sought to be raised in the City's answer was sustained. The City claims this ruling was erroneous. It need not be considered until the Railroad's appeal has been disposed of.

■ The City invokes §§ 7530–7536, RSMo 1939 (§§ 1–8 of Laws 1909, p. 364); stressing § 7532 (§ 3 of said Act of 1909), and an agreement between the Railroad and the City of December 28, 1949, wherein the Railroad agreed to reimburse the City if held liable therefor by a court of competent jurisdiction. The Revision Committee of 1949 rearranged said sections, and they now appear as RSMo 1959, V.A.M.S., §§ 389.-670–389.690; said §§ 7530, 7531 and 7532 being ¶¶ 1, 2 and 3, respectively, of § 389.-670; § 7533 being ¶ 1 and § 7534 being ¶¶ 2 and 3 of § 389.680; and §§ 7535 and 7536 being ¶¶ 1 and 2, respectively, of § 389.690. The sense, meaning and effect of said statutes were not affected by such rearrangement. See Mo.Const.1945, Art. III, § 21; RSMo 1949, § 3.060; Kansas City v. Travelers Ins. Co., Mo.App., 284 S.W.2d 874, 878 and authorities cited. The "catch words" appearing in connection with the public statutes are not part of the bill. State v. Lawson, 352 Mo. 1168, 181 S.W. 2d 508, 513[8].

The title of the act, Laws 1909, p. 364, states it is "for the purpose of facilitating the building of sewers in incorporated" Missouri cities having a population of 30,000 or less "and fixing the duties of" railroads.

"in relation thereto, and providing penalties against them for * * * failure * * * to perform such duties * * *."

Section 7530 (§ 1 of the Act) makes it the duty of railroads passing through such cities "to construct at their own expense, within the corporate limits of such village, town or city along the lines of their said railroads or railroad right of way, such sewers as shall be of sufficient capacity to at all times carry off all the surface water that may collect or accumulate along their right of way."

Section 7531 (§ 2 of the Act) provides that such sewers be constructed in a substantial manner, specifies certain requirements and that they "shall be of sufficient volume and depth to carry off at all times all surface water, with such facility as to prevent at all times an overflow therefrom"; and have "good, safe wagon and foot crossings constructed over them."

The City does not question that §§ 7530 and 7531 apply to the drainage of storm and surface water accumulating along railroad rights-of-way. Terminal R. R. Ass'n of St. Louis v. City of Brentwood, 360 Mo. 777, 230 S.W.2d 768; Chicago, B. & Q. R. Co. v. City of North Kansas City, 8 Cir., 276 F.2d 932, 934.

Section 7532 (§ 3 of the Act and stressed by the City) reads: "It shall be the further duty of all such * * * corporations to construct under their railways, from one side of their right of way to the other, such sewers as shall by the city council, board of aldermen or legislative body of such villages, towns or cities be deemed necessary to facilitate the proper drainage of such village, town or city as provided herein."

Section 7533 (§ 4 of said Act) provides that when, by ordinance, it is deemed "necessary to construct any public or district sewer," such city shall cause to be filed plans and specifications for such sewer with its clerk, and cause a copy thereof to be served on the railroad involved, to-

gether with a notice to construct said sewer from one side of its right-of-way to the other within "not less than thirty days, and not more than three months" after the service of said notice.

Section 7534 (§ 5 of the Act) provides for the manner of the service of such notice, et cetera, and that: "Thereupon such person, company or corporation shall proceed to construct such section of the proposed sewer at their own expense."

Sections 7534, 7535 and 7536 provide penalties for the failure by a railroad to construct such sections of a proposed sewer and impose liability for double damages from overflow occasioned by its failure to comply with the Act. See Atchison, T. & S. F. Ry. Co. v. Ross, W.D.Mo., 88 F.Supp. 451, 454[4].

Material facts have been stipulated by the parties.

In 1949 North Kansas City was a city of the Fourth Class with less than 30,000 inhabitants. It was vested with authority to provide for drains and sewers and to levy taxes to pay therefor. (RSMo 1939, §§ 7197, 7181, 7182; RSMo 1949, §§ 88.670, 88.717, 88.720 respectively.) It took the following official action with respect to the sewer here involved.

By Ordinance No. 1460 adopted February 1, 1949, the City called a special election for submitting a proposition to increase the City's indebtedness and issue $700,000 of negotiable general obligation coupon bonds, payable out of an annual tax levied in addition to other taxes, "for the purpose of acquiring rights of way, constructing, extending and improving the sanitary and storm sewer systems of said City."

Ordinance No. 1469, adopted March 8, 1949, found and declared that said election resulted in favor of said $700,000 increased indebtedness and the issuance of said bonds.

By Ordinance No. 1470, adopted March 8, 1949, the City authorized the issuance of said $700,000 Sanitary and Storm Sewer

general obligation bonds and levied an annual ad valorem tax on all taxable tangible property in the City for the discharge of the principal and interest of said bonds.

By Ordinance No. 1498, adopted May 24, 1949, the construction of a combination storm and sanitary sewer and sewage pumping station, to be known as the "26th Avenue Storm and Sanitary Sewer," was authorized, the Board of Aldermen deeming "it necessary for sanitary purposes and for the purpose of providing for the disposition of storm waters"; and provided that the cost of "said combination storm and sanitary sewer and sewage pumping station be paid by appropriation from the fund established by the sale of the Public Sewer Bonds * * * authorized by Ordinance No. 1470."

The City caused the plans, profile and specifications for the sewer referred to in Ordinance No. 1498 to be filed with its clerk on May 24, 1949, in conformity with RSMo 1939, § 7533.

July 19, 1949, by Ordinance No. 1510, the contract for the construction of all but the pumping station of the 26th Avenue Combined Storm and Sanitary Sewer System was awarded to C. S. Foreman Company, and a written agreement between said City and said Company was entered into on said date for the construction of said sewer.

The Chicago, Burlington & Quincy Railroad Company engages in interstate and intrastate commerce in Missouri. It owns 796 acres of land and other property within the City. Its yard extends north and south, borders the east side of and is parallel to the Missouri River, and has eighteen tracks lying parallel to the River. The parties agree that such tangible property has been and will be, along with the property of others, taxed for the payment of said bonds and interest (RSMo 1939, §§ 7198, 7367, now §§ 88.677, 88.100), and Railroad has paid said taxes as levied.

The 26th Avenue sewer begins at 21st and Howell Streets, extends north to 26th Avenue, proceeds westwardly about, we understand, 1½ miles, passes under the Railroad's property and terminates in an outlet in the Missouri River. The sewer pipe is 4-foot pipe at the beginning and 72-inch pipe across the Railroad yard and at the River.

The Railroad, in 1946, granted the North Kansas City Levee District a 58.5-foot permanent easement west of its tracks along the Missouri River for a flood control levee. The Army Engineers would not permit the contractor to go through the levee in an open cut, and the flow line of the sewer is 39 feet below the top of the levee.

Construction work began in August, 1949, at the Missouri River and was completed about June, 1951. It was determined about December 1, 1949, that the City had no easement over the Railroad's yard and the contractor's superintendent, when the construction approached the Railroad's property, was told not to come on the property. On December 1, 1949, the Railroad was served with a notice to construct the sewer from one side of its right-of-way to the other "within thirty days" and with a copy of the plans, profile and specifications. This notice stated the sewer was designed to carry off "storm water" and "domestic sewage."

Charles S. Foreman, the contractor, was informed there was some difficulty about the City's right to go upon the Railroad's property; and a letter from the Mayor of the City, dated December 7, 1949, directed him to stop work. On December 28, 1949, the City and the Railroad entered into an agreement concerning the controversies between them. The contractor resumed work on December 29 and completed tunneling under Railroad's tracks April 16, 1950. He had no discussion with the City about and had no intention of giving up any part of his contract to construct the entire sewer.

The City and the Railroad wanted the construction work to proceed without prejudice to either party's rights or contentions,

and their written agreement of December 28, 1949, so far as deemed material here, was to the effect that the City was authorized to construct and maintain the sewer line across the Railroad's yard; and that if it were finally determined by a court of competent jurisdiction that Railroad was obligated to construct said part of said sewer, Railroad would reimburse City for its reasonable costs in constructing the same.

Burlington Avenue (Highway 71) runs north and south, is higher than and approximately a quarter mile east of the Railroad's right-of-way, and said right-of-way is higher than where the 26th Avenue sewer begins. The Court of Appeals found that Burlington Avenue formed a solid barrier between the train yard and a large portion of the 234-acre area served by the sewer, and that the natural drainage for the bulk of the area was not over the Railroad's yard. There was testimony of some ponding of rain waters between Burlington Avenue and the Railroad's property. The flow line of the sewer is westwardly and is 18 feet below the surface at the east property line of the Railroad. We understand the storm water at first entered the sewer at nineteen points, all east of Burlington Avenue, but some storm water now enters the sewer west of said avenue. On March 22, 1950, the City secured temporary permission from the Division of Health of Missouri to discharge sanitary sewage into the 26th Avenue sewer from 360 residences. Additional sanitary sewage connections have been made since completion of the sewer, and sanitary sewage was being carried by the sewer at the time of trial, July, 1961. For the City there was testimony that less than ½ of 1% of the capacity of the sewer was used for sanitary purposes. The Railroad adduced testimony that taking a normal rainfall for a year's period, the storm flow would amount to approximately 70%, and the sanitary flow would amount to about 30%.

The City's Mayor, Robert B. Scharz, testified the voters had authorized $2,843,-000.00 of revenue bonds on October 11, 1960, which included funds to carry out plans for a sewer to carry the sanitary sewage which had been and at the time of trial (July, 1961) was being carried by the 26th Avenue sewer.

The contention by a city that the words "further duty," "such sewers" and "necessary to facilitate the proper drainage" in § 7532 and "any public or district sewer" in § 7533 showed a legislative intent to and made a railroad liable under §§ 7530–7536, supra, to construct any type of sewer, particularly a sanitary sewer, across its right-of-way was overruled in Terminal R. R. Ass'n of St. Louis v. City of Brentwood, 360 Mo. 777, 230 S.W.2d 768. We considered the reference to "drainage" of towns in § 7532 to be against the City's contention (l. c. 769), and any ambiguity as to the type of sewers included arising from any general reference to sewers in §§ 7532 and 7533 yielded to the rule of statutory construction "that specific designations will control over general terms." We said: "Since these sections, 7530–7536, were all part of a single Act, we think they must be read and construed together. So considered, we think they all apply only to drainage sewers and that it was drainage of storm and surface water for which the Act was intended to provide."

The words "as provided herein" in connection with facilitating "the proper drainage of such * * * town" in § 7532 refer to the drainage of surface water mentioned in § 7530 (the other section that imposes construction duties) if the Act be construed as a whole, as § 7532 is otherwise complete without "as provided herein."

After considering other statutes, including RSMo 1939, §§ 7181, 7182, and 7367, we held in Brentwood (l. c. 770) that §§ 7530–7536 were adopted to provide for the drainage of surface water which might accumulate along or be obstructed by railroad structures and not to change the situation as to sanitary sewers and "that these

railroads cannot be compelled to construct the proposed sanitary sewers across their rights of way and under their tracks."

The provision for "good, safe wagon and foot crossings constructed over" the sewers, which are to be "cemented on their sides and bottoms" under § 7531, shows (Brentwood, 1. c. 768, 769) that open drains were intended. We doubt that the Legislature contemplated draining surface water up grade.

The Brentwood case (1. c. 770) further stated that sanitary sewers are much more complicated and costly than surface water drainage sewers, and if the Legislature had intended to include them, something more than drainage would have been mentioned. We think this observation well taken, and our credulity is somewhat taxed by testimony that the open drainage sewer contemplated by the statute on rather level terrain would be as costly as a sanitary sewer.

■ The statutory obligation of a railroad under §§ 7530–7536 is not based on a ratio of the flow of sanitary sewage to the capacity of a sewer or a ratio of its flow to the total flow. If §§ 7530–7536 "apply only to drainage sewers," as stated in Brentwood (1. c. 769), then a combination sanitary and storm sewer would not be within the Act. We think the 26th Avenue sewer, which since construction has carried and still carries sanitary sewage with pipes buried at different depths underground and sewage pumping station to maintain the flow, not to be within the legislative intent of the Act of 1909 (said §§ 7530–7536). We conclude the Railroad is not liable for the construction of the City's 26th Avenue sewer across its right of way.

We are also of opinion additional grounds exist for not placing the construction costs here involved upon the Railroad.

■ The Board of Aldermen of the City was vested with authority to provide for public and district sewers. RSMo 1939, §§ 7181, 7182, 7367. Under § 7181: "The board of aldermen may levy a tax on all property made taxable for state purposes over the whole city, to pay for" constructing public sewers. The City could act only through its authorized governing body, its board of aldermen, with respect to the establishment of its sewers. Barton County Rock Asphalt Co. v. City of Fayette, 236 Mo.App. 505, 155 S.W.2d 771, 774[6]; City of Nevada, to use of Gilfillan v. Eddy, 123 Mo. 546, 558, 559, 27 S.W. 471[1]; 62 C.J.S. Municipal Corporations §§ 152, 153, pp. 312, 313.

The City by Ordinance No. 1460 submitted to the voters the proposition to increase its indebtedness and issue general obligation bonds in the amount of $700,000 "for the purpose of acquiring rights of way, constructing, extending and improving" its sanitary and storm sewer systems. The proposition was approved by the voters and the City authorized the issuance of said $700,000 of bonds and levied an annual ad valorem tax on all taxable tangible property for the discharge of the principal and interest of said bonds (Ordinance No. 1470). Ordinance No. 1498, authorizing the construction of the "26th Avenue Storm and Sanitary Sewer," expressly directed that the costs of constructing said combination storm and sanitary sewer be paid from the funds realized by the sale of the bonds authorized by Ordinance No. 1470. Ordinance No. 1510, awarding the contract for the construction of the sewer, and the contract thereunder, did not exempt that portion of the sewer under the Railroad's right-of-way from the contract awarded.

■ In these circumstances the City through its Board of Aldermen, with the approval of its citizens voting at a special election, stands committed to using said "26th Avenue Sewer" as a storm and sanitary sewer and the payment of its construction and the construction of its sewage pumping station out of the funds realized from the sale of the general obligation bonds authorized by Ordinance No. 1470.

We find and are directed to no ordinance of the Board of Aldermen of the City attempting to change this situation. We know of and are directed to no authority vested in the Mayor, the City Attorney, or other person, without authorization by the board of aldermen, to make such a change and place the costs of constructing said storm and sanitary sewer on the Railroad.

■ This court abstains from determining constitutional questions that are unnecessary to a disposition of a case. Glidewell v. Hughey, Mo., 314 S.W.2d 749, 756 [10]; State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75, 79[5], and see State ex rel. Kemper v. Kirby, 345 Mo. 801, 136 S.W.2d 319, 322, 124 A.L.R. 1331 (concurring opinion of Ellison, J.).

The case having broken on the Railroad's appeal, there is no occasion to consider the appeal of the City wherein it sought to expand the issues for a determination of the whole case on the merits, embracing a money judgment in its favor. The curious are referred to Spector Motor Service, Inc. v. Walsh, 135 Conn. 37, 61 A.2d 89, 91[4, 5, 21]; Annotations, 94 L.Ed. 879; 3 L.Ed.2d 1827; Harrison v. National Ass'n for the Advancement of Colored People, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Chicago, B. & Q. R. Co. v. City of North Kansas City, 8 Cir., 276 F.2d 932, 937[2]–940; 36 C.J.S. Federal Courts § 10(2), p. 52.

The judgment is reversed and the cause is remanded with directions to enter a judgment in conformity herewith.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.